Melanie Haswood, *pro se*
Brian Gilmore, *pro se*
Elie Lahhoud, *pro se*
Bradley Ledford, *pro se*
Dean Bausman, *pro se*
William Reynolds, *pro se*
Nancy Farran, *pro se*
Devin Brennan, *pro se*
C/o 202 E. McDowell Rd., Suite 258
Phoenix, AZ  85004
602-272-8123 – Office
602-272-9735 – Fax
m.haswood@azpeinc.com
b.gilmore@azpeinc.com
elahoud2006@hotmail.com
b.ledford@azpeinc.com
coloradopolygraph@gmail.com
billsawmill@gmail.com
nancyfarran@yahoo.com
dbrennan32@yahoo.com

Kelley Bradbury, *pro se*
Timothy Roberts, *pro se*
15620 W. Myrtle Ave
Litchfield Park, AZ  85340
623-256-1664
623-326-8577
mhigurl@gmail.com
stickypickle@aol.com

Morgan Block
2036 S. St. Michael Dr.
Tucson, AZ  85713
520-270-3597
block.morgan@gmail.com

Dan Thomas, *pro se*
9805 Burns Drive
Sun City, AZ  85351
360-524-1066
liveaboardpdx@yahoo.com

John Does I-X, *pro se*
Jane Does I-X, *pro se*
Addresses unknown

CV-14-00253-PHX-GMS

1

1
2
3
4
5
6
7
8
**IN THE UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF ARIZONA**

Melanie Haswood, et al.,                         )
                       Plaintiffs,            ) Case No.: CV
                                  )
                                  )
vs.                                              ) **COMPLAINT**
                                  )
American Polygraph Association, et, al., )
                                  ) **JURY TRIAL DEMANDED**
                Defendants.             )
_____ )

Plaintiffs individually bring this action against the American Polygraph Association ("APA"), Barry Cushman ("Cushman"), Charles Slupski ("Slupski"), Pam Shaw ("Shaw"), George Baranowski ("Baranowski"), Robert Peters ("Peters"), Walt Goodson ("Goodson"), Jamie (James) McCloughan ("McCloughan"), Raymond Nelson ("Nelson"), Mike Gougler ("Gougler"), Vicki T. Murphy-Carr ("Murphy-Carr"), Chad Russell ("Russell"), Donald Krapohl ("Krapohl"), Robbie S. Bennett ("Bennett"), Donnie Dutton ("Dutton"), and Roy Ortiz ("Ortiz").  The following allegations are based on the investigation of the Plaintiffs and upon information and belief.

# I.    NATURE OF THE ACTION

1.    This is a civil antitrust action seeking treble damages and other relief arising out of Defendants' anticompetitive scheme to exclude competition from the market for students seeking education in the polygraph technology field and accreditation of polygraph schools.

2.    Antitrust law is the law of competition. It is concerned with wrongs committed against competition on the merits in a given line of commerce or market.   Broadly speaking, antitrust laws seek to promote fair competition on the merits and to protect consumers and wronged competitor businesses from anti-competitive business practices ——— practices undertaken in effort to undermine competitive commercial behavior in a given market or line of commerce.

3.    The antitrust laws therefore forbid the wrongful acquisition or preservation of monopoly power, the abuse of monopoly power in order to establish a new monopoly, and concerted restraints of trade.  They also govern proposed mergers and acquisitions that are sufficiently large to constitute a threat to competition, and they address commercial practices that pose an arguable danger to competition on the merits in a properly defined antitrust market.

4.    The antitrust laws apply to virtually all industries and to every level of business, including manufacturing, transportation, distribution, educational institutions and marketing. They prohibit a variety of practices that restrain trade.  Examples of illegal practices are price-fixing

conspiracies, corporate mergers likely to reduce the competitive vigor of particular markets, and predatory acts designed to achieve or maintain monopoly power.

5.   Business schools, vocational schools and colleges are contributing tremendously to the development of the national and global economies through innovative programs and training.  They are extremely dominant in the development of effective knowledge leaders and knowledge workers who steer 21st century progress.  This is because business schools and colleges are "a major force, both as globalizing influences and trend setters in value and industry practices."[1]  The impact of business schools and colleges on the national and global economies is cited by *Cavico, Mujtaba and McFarlane* to be in the sheer millions of graduates earning business degrees at all levels annually in the United States and across the globe.  Given the need for business training and education in a globalizing economy, hundreds of business and vocational schools, colleges and programs become operational each year and the need for accreditation is the reality of the current school economy, school model and global education industry.

6.   Since Polygraph schools are few and far between they are essentially a

_____

[1] Cavico, F.J., Mujtaba, B.G. & McFarlane, D.A. (2010).  *The State of Business Schools:  Educational and Moral Imperatives for Market Leaders.*  Davie, Florida: ILEAD Academy

4

"niche" market in the education realm – a small area of trade within the economy, involving specialized products or services.  Currently there are only 14 APA accredited polygraph schools open to the general public in the United States.  Out of the 14 APA schools in the United States, eight (8), over one half, are managed, owned, operated and/or directed by APA Board of Director Members ("DOB").

7.      With the economy in disarray, competition among all aspects of commerce has become fierce and Post-secondary education institutes are no exception.  In February of 2012, Ms. Laura M. Wells, Bradbury, Block and Gilmore created a Hybrid polygraph course which generated much interest and income for Ms. Wells, Bradbury, Block and Gilmore through the Polygraph School of Science, Inc. where they were employed. This Hybrid course complied with the exact same classes and class hours as the on-campus classes.  The main difference is that certain portions were held online and then the remaining classes held on-campus.  By offering this new genre, more students were able to attend Polygraph School of Science, Inc. ("PSS") at a substantial cost savings. This genre was very successful and proved above-average test scores, which enabled PSS to gain more of the market share of students.  PSS was the only APA accredited polygraph school in Arizona, which a desirable school location.

8.      As alleged below, the Defendants planned and carried out a complex and anticompetitive scheme, undertaken in conjunction with each other to

illegally restrain trade and artificially maintain and abuse APA's monopoly power in the market for students seeking education in the polygraph technology field and accreditation of polygraph schools to the detriment of the Plaintiffs.

9.   APA became the leading accrediting body for polygraph schools by effectively carrying out anticompetitive schemes, by limiting the number of accredited schools and giving special consideration to schools owned, operated and/or controlled by members of the Board of Directors for APA in an attempt to monopolize the market share of students wishing to gain an education in this distinct market.

10.   Although APA is a nongovernmental organization with no official regulatory authority, many state governments, law enforcement agencies and state licensing boards have adopted its standards or begun requiring APAs accreditation "as a contractual prerequisite" to engaging the administration of polygraph technology education.

11.   The benefits of attending an APA-accredited school are many. Because the APA is recognized nationally, graduation from an APA accredited school satisfies certification and licensing requirements in most, if not all, states. In addition, only students who graduate from accredited programs are eligible for membership in the APA.

12.   Given the importance of APA's accreditation in the polygraph field, it was vital that schools owned, controlled and/or operated by APA Board of Director ("BOD") Members be insulated from competition for as long

as possible. A scheme was devised by the Defendants, employing various unlawful predatory anticompetitive tactics to insulate BOD member's APA accredited schools from competition.

13.     The defendants' plan to stop competition into this relevant market began in October of 2012, when Ms. Wells, Bradbury, Block and Gilmore, who were all at the time employees of the Polygraph School of Science, Inc., introduced the new and very successful Hybrid Program into the Polygraph School of Science's ("PSS") curriculum, which allowed students to take a portion of the polygraph technologies course work online and the remainder on campus, thus decreasing the student's overall cost of attending polygraph school, as the student would not have to spend extra monies on housing, food and travel for the online portion of the polygraph course.

14.     This new Hybrid Program allowed Ms. Wells, Bradbury, Block and Gilmore to gain more students for PSS and substantially increased their standing in this market. After learning of this new Hybrid program and how successful it had become, the defendants then alleged that the Hybrid Program was invalid as it did not conform to APA standards even though it exceeded APA guidelines, and then the defendants systematically and effectively, without due process, revoked the APA accreditation of PSS.

15.     PSS had been an APA accredited polygraph school under the name Arizona School of Polygraph Science, since 1985 with no incident until

the introduction of the Hybrid Program which gained PSS the majority market share of students.

16.   While Ms. Wells. Bradbury, Block and Gilmore were trying to save their accreditation, the defendants began their anticompetitive scheme to thwart competition entry into the market by allowing BOD Members, who had a market stake in their own APA accredited polygraph schools, to vote on the revocation and/or accreditation of other polygraph schools.

17.   The anticompetitive scheme continued in November 2012, when Board of Director Members Shaw, Krapohl, Dutton, Gougler, Murphy-Carr, Nelson, Slupski and McCloughan, who all had a stake in other APA accredited polygraph schools, were allowed to vote on the revocation of PSS's APA accreditation in order to gain a substantial market share of the potential polygraph students for their own benefit, gaining an unjust enrichment and effecting a contract between the defendants to engage in an anticompetitive scheme to deprive Ms. Wells, Bradbury, Block and Gilmore their fair market share of students seeking education in polygraph technologies.

18.   In October 2012, Slupski did contact plaintiff Farran ("Farran") regarding the accreditation of PSS.  In this conversation, Slupski informed Farran "off the record" that PSS was going to have its accreditation revoked by the defendants and that she should attend his school to get her Post-Conviction Sex Offender Training (PCSOT) Certificate.  Farran was currently enrolled at PSS to attend PCSOT classes.  Defendant Slupski

was adamant that Farran attend his school and used "scare tactics" and predatory means to persuade Farran to change schools. Farran, in fear of not being able to attain her APA membership, did in fact attend Slupski's school. When Farran applied to APA for membership, Slupski wrote "recruited by Charles Slupski" on the top of her application. Slupski then voted to revoke PSS's APA accreditation using the illegal tactics of an anticompetitive scheme.

19.   On November 15, 2012, just days after voting to revoke PSS's APA accreditation, the anticompetitive scheme advanced when Shaw and Gougler started their own "traveling" polygraph school, The National Polygraph Academy ("NPA"), which would have been in direct competition with PSS, had PSS's accreditation not been revoked by the hands of Shaw and Gougler, Slupski, Goodson, Dutton, Krapohl, Cushman, McCloughan, Peters, Baranowski, Nelson, Murphy-Carr and Russell, who were all voting members of the APA BOD.

20.   Voting members, Shaw, Gougler, Slupski, Goodson, Dutton, Krapohl, Cushman, McCloughan, Peters, Baranowski, Nelson, Murphy-Carr and Russell ("Voting Members") of the BOD collectively devised an anticompetitive scheme to limit the number of APA accredited polygraph schools to benefit their own interests and/or the interests of BOD members who had interests in their own APA accredited polygraph schools in order to monopolize the market share of students wishing to gain an education in the polygraph technologies market.

21.   Non-voting members of BOD, Bennett and Ortiz ("NVM"), assisted in this anticompetitive scheme by intentionally falsifying documents, filing false reports and negligently failing to mail significant documents to PSS regarding their accreditation.

22.   At the time in question, the APA had, in place, an Accreditaiton [sic] Manual 2004 ("The Manual") which fully outlined the accreditation process for APA accreditation; however in their unlawful anticompetitive scheme, the defendants failed to follow their own rules and regulations in order to benefit their own interests and/or the interests of BOD members who had a market stake in their own APA accredited polygraph schools.

23.   On November 5, 2012, in order to predicate their unlawful revocation of PSS's APA accreditation and to justify their anticompetitive scheme, McCloughan, dispatched Ortiz to PSS allegedly for an unannounced and unscheduled inspection of PSS; however Ortiz's "inspection" did not follow any of the guidelines set forth in the manual and as such a false report was generated by Ortiz.   The report was then delivered to McCloughan who distributed the false report to other members of the BOD, who used this false report as an instrument for grounds to revoke the APA accreditation of PSS and further their unlawful anticompetitive scheme to control the market share of students in the polygraph technology field.

24.   The voting members of APA and the NVM collectively and unlawfully entered into an agreement with one another in an anticompetitive scheme

to restrict the number of APA accredited polygraph schools for the sole benefit of the BOD members who have interests in other APA polygraph schools in an effort to gain an unfair market share of students.

25. This overreaching, anticompetitive scheme created by APA and instituted by all defendants substantially limited the number of students Ms. Wells, Bradbury, Block and Gilmore could retain and attain in this market and substantially increased Shaw, Gougler, Slupski, Dutton, Krapohl, McCloughan, Nelson and Murphy-Carr's student enrollment creating an unjust enrichment. The impact the defendant's scheme had on this market cannot be overstated. "But for" the illegal and anticompetitive conduct, Ms. Wells, Bradbury, Block and Gilmore would have been able to continue training more students in the polygraph technologies field at a cost-savings to students and Bradbury, Block and Gilmore would not have lost their jobs.

26. Using predatory means, the defendants then initiated a smear campaign against PSS stating that Ms. Wells, Bradbury, Block and Gilmore were delivering "substandard" polygraph education training. This smear campaign was initiated with the sole purpose of discrediting Ms. Wells, Bradbury, Block and Gilmore to further dissipate PSS's student enrollment and further enhance the enrollment of BOD member's schools. In addition, this smear campaign undermined the education received by students Haswood, Brennan, Bausman, Farran, Reynolds,

Roberts, Lahhoud and Thomas to the point where they essentially became unemployable.

27.    By systematically eliminating the competition, APA BOD members who have interests in their own schools drastically benefited from an unjust enrichment by effectively eliminating PSS from this market, undermined competition in this distinct market, and this injury to competition has specifically harmed the plaintiffs.

28.    Plaintiffs bring this action on behalf of themselves, all who have suffered due to the illegal predatory anticompetitive scheme devised by the defendants.  Plaintiffs seek a judgment declaring the defendants' overall anticompetitive scheme is unlawful under Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Plaintiff also seeks an injunction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, enjoining the continuation of the anticompetitive conduct. Unless enjoined, Defendants' unlawful conduct will continue unchecked and Plaintiff and future students will continue to bear the financial brunt of Defendants' antitrust violations. Plaintiffs also assert claims for compensatory and/or treble damages and equitable relief for continuing violations of the state laws enumerated below.

## II.    JURISDICTION

29.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because this is an action in which the aggregate amount in controversy exceeds $75,000.00 and at least one member of the punitive

class is a citizen of a state different from that of one of the defendants.

30.   This Court also has jurisdiction over this matter pursuant to 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337 in that Plaintiff brings claims under Section 16 of the Clayton Act, 15 U.S.C. § 26, for injunctive and equitable relief to remedy the Defendants' violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2. The Court has supplemental jurisdiction over Plaintiff's pendent state law claims pursuant to 28 U.S.C. § 1367. 21.

31.   Venue is appropriate within this district under Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. §1391(b) and (c), because Defendant transacts  business within this district, and/or has an agent and/or can be found in this district, and the interstate trade and commerce, hereinafter described, is carried out, in substantial part, in this district.

### III.   THE PARTIES

**Plaintiffs**

32.   Kelley L. Bradbury is adult white Jewish female and a citizen of the United States, who resides in the State of Arizona, and is at all times material to this action and at the present time employed as Financial Aid Director and Administrator of Polygraph School of Science, Inc. located in Phoenix, Arizona.

33.   Morgan M. Block is an adult white Jewish male and a citizen of the United States, who resides in the State of Arizona, and is at all times material to this action and at the present time employed as Hybrid

13

Administrator of Polygraph School of Science, Inc. located in Phoenix, Arizona.

34.    Melanie Haswood is adult Native American female and a citizen of the United States, who resides in the State of Arizona on the Navajo Reservation, and is at all times material to this action and at the present time employed as an administrative assistant at Polygraph School of Science, Inc. located in Phoenix, Arizona.

35.    Brian Gilmore is an adult white male and a citizen of the United States, who resides in the State of Arizona, and is at all times material to this action and at the present time employed as an IT Manager at Polygraph School of Science, Inc. located in Phoenix, Arizona.

36.    Bradley Ledford is an adult Native American and a citizen of the United States, who resides in the State of Arizona, and is at all times material to this action and at the present time is a Hybrid Course Graduate of Polygraph School of Science, Inc., , located in Phoenix, Arizona.

37.    Elie Lahhoud is an adult Syrian-Born, Christian male, a disabled Veteran of the United States Army CBWTU program who is changing his carrier from a soldier to a civilian job (polygraph examiner) due to his war injuries and a citizen of the United States, who resides in the State of Arizona, and is at all times material to this action and at the present time is an On-Campus Day Course Graduate of Polygraph School of Science, Inc., located in Phoenix, Arizona.

38.     Timothy Roberts is an adult white male and a citizen of the United
States, who resides in the State of Arizona, and is at all times material
to this action and at the present time is an On-Campus Day Course
Graduate of Polygraph School of Science, Inc., located in Phoenix,
Arizona.

39.     Devin Brennan is a white adult male and citizen of the United States,
who resides in the State of Idaho, and is at all times material to this
action and at the present time is a Hybrid Course Graduate of
Polygraph School of Science, Inc., located in Phoenix, Arizona.

40.     Dean Bausman is an adult white male and a citizen of the United
States, who resides in the State of Colorado, and is at all times material
to this action and at the present time is a Hybrid Course Graduate of
Polygraph School of Science, Inc., located in Phoenix, Arizona.

41.     William Reynolds is an adult white male and a citizen of the United
States, who resides in the State of Arizona, and is at all times material
to this action and at the present time is a Hybrid Course Graduate of
Polygraph School of Science, Inc., located in Phoenix, Arizona.

42.     Nancy Farran is an adult white female and a citizen of the United
States, who resides in the State of Oregon, and is at all times material to
this action and at the present time is a Hybrid Course Graduate of
Polygraph School of Science, Inc., located in Phoenix, Arizona.

43.     Dan Thomas is an adult white male, a disabled Veteran of Unites States
Air Force who is changing his career from a soldier to a civilian job

15

(polygraph examiner) due to his war injuries and a citizen of the United States, who resides in the State of Arizona, and is at all times material to this action and at present time is an On-Campus Day Course Graduate of Polygraph School of Science, Inc., located in Phoenix, Arizona.

44.   John Doe, whose identity is unknown at this present time, is at all times material to this action.

45.   Jane Doe, whose identity is unknown at this present time, is at all times material to this action.

**Defendants**

46.   American Polygraph Association, herein after referred to as "APA", is an association headquartered in the State of Tennessee.  Established in 1966, the APA consists of over 2800 members and is the governing association for polygraph schools.

47.   Barry Cushman is a white male citizen of the United States, who resides in the State of Maine, and at all times material to this action and at the time of the original filing of this immediate action was President of APA, who is now Chairman of the Board for APA and, as such was the immediate supervisor of the Board of Directors and Committee Members of the American Polygraph Association and has voted on matters concerning American Polygraph Association Accreditation for Polygraph Schools.  Mr. Cushman is being sued ~~as~~ in his individual capacity.

16

48.   Charles Slupski is a white male citizen of the United States, who resides in the State of Georgia, and at all times material to this action and at the present time Director of American International Institute of Polygraph, an APA Accredited Polygraph School.  Mr. Slupski, at the time of original filing of this Complaint was President Elect of American Polygraph Association, but is currently the President of APA, and, as such an immediate over-seer of the Board of Directors and Committee Members of the American Polygraph Association and has voted on matters concerning American Polygraph Association Accreditation for Polygraph Schools.  Mr. Slupski is being sued in his individual capacity.

49.   Pam Shaw is a white female citizen of the United States, who resides in the State of Kentucky, and at all times material to this action and at the present time Director/owner of National Polygraph Academy and was previously Director of Kentucky Institute for Polygraph Studies, both of which are APA Accredited Polygraph Schools.  Ms. Shaw, at the time of original filing of this Complaint was also Chairman of the Board of the American Polygraph Association, and, as such, the immediate supervisor for Committee Members of the American Polygraph Association and has voted on matters concerning American Polygraph Association Accreditation for Polygraph Schools.  Ms. Shaw is currently a Director on the Board of Directors for APA.  Ms. Shaw is being sued in her individual capacity.

50.   George Baranowski is a white male citizen of the united States, who

17

resides in the State of Indiana, and at all times is material to this action and, at the time of original filing of this Complaint was present time Vice President Private of APA, and, as such, has voted on matters concerning American Polygraph Association Accreditation for Polygraph Schools. Mr. Baranowski is currently a Director on the Board of Directors for APA.  Mr. Baranowski is being sued in his individual capacity.

51.   Robert Peters is a white male citizen of the United States, who resides in the State of Virginia, and at all times is material to this action and, at the time of original filing of this Complaint was APA Vice President Government, and, as such, has voted on matters concerning American Polygraph Association Accreditation for Polygraph Schools.  Mr. Peters, is being sued in his individual capacity.

52.   Walt Goodson is a white male citizen of the United States, who resides in the State of Texas, and at all times is material to this action and at the present time APA Vice President Law Enforcement, and, as such has voted on matters concerning APA Accreditation for Polygraph Schools. Mr. Goodson is being sued in his individual capacity.

53.   James McCloughan is a white male citizen of the United States, who resides in the State of Michigan, and at all times is material to this action and at the present time APA Director and General Chair Education Accreditation Committee, and, as such, has voted on matters concerning APA Accreditation for Polygraph Schools.  Mr. McCloughan is being sued in his individual capacity.

54.   Raymond Nelson is a white male citizen of the Unites States, who resides in the Country of Mexico, and at times is material to this action and at the present time Director for National Polygraph Studies Center, an American Polygraph Association Accredited Polygraph School. At the time of original filing of this Complaint Mr. Nelson was a Director and Research & Development Committee Member for American Polygraph Association, and, as such has voted on matters concerning American Polygraph Association Accreditation for Polygraph Schools. Mr. Nelson is currently President Elect of APA. Mr. Nelson is being sued in his individual capacity.

55.   Mike Gougler is a white male citizen of the United States, who resides in the State of Texas, and at times is material to this action and at the present time he is employed by the National Polygraph Academy and Director for American Polygraph Association, and, as such has voted on matters concerning American Polygraph Association Accreditation for Polygraph Schools. Mr. Gougler is being sued in his individual capacity.

56.   Vickie T. Murphy-Carr is a white female citizen of the United States, who resides in the State of Maryland, and at times material to this action, is currently the assistant Polygraph School Director of the Maryland Institute of Criminal Justice and at the time of original filing of this Complaint was Secretary of American Polygraph Association, and, as such has voted on matters concerning American Polygraph Association Accreditation for Polygraph Schools. Ms. Murphy-Carr is being sued in

19

her individual capacity.

57.   Chad Russell is a white male citizen of the United States, who resides in the State of Nevada, and at times material to this action and at the present time Treasurer of American Polygraph Association, and, as such has voted on matters concerning American Polygraph Association Accreditation for Polygraph Schools.  Mr. Russell is being sued in his individual capacity.

58.   Donald Krapohl is a white male citizen of the United States, who resides in the State of South Carolina and at times material to this action and at the present time Special Assistant to the Chief, at the National Center for Credibility Assessment, an APA Accredited polygraph school and Editor of American Polygraph Association, and, as such has voted on matters concerning American Polygraph Association Accreditation for Polygraph Schools. Mr. Krapohl is being sued in his individual capacity.

59.   Robbie S. Bennett is a white female citizen of the United States, who resides in the State of Tennessee and at all times material to this action and at the present time National Office Manager of American Polygraph Association, and, as such has completed correspondence, prepared documents and preformed other general duties of an Office Manager on matters concerning American Polygraph Association Accreditation for Polygraph Schools and further is responsible for the mailing of Accreditation Materials.  It is unclear at time whether or not Ms. Bennett has voting rights on matters regarding the Accreditation of Polygraph

Schools.  Ms. Bennett is being sued in her individual capacity.

60.     Donnie Dutton is a white male citizen of the United States, who resides in the State of South Carolina and at times material to this action, at the time of original filing of this Complaint was Director of American Polygraph Association, and, as such has voted on matters concerning American Polygraph Association Accreditation for Polygraph Schools. Mr. Dutton is currently Vice-President Government of APA and employed by the National Center for Credibility Assessment, an APA Accredited School. Mr. Dutton is being sued in his individual capacity.

61.     Roy Ortiz is an Hispanic male citizen of the United States who resides in the State of California and at all times material to this action and at the present Education Accreditation Member of American Polygraph Association, and, as such conducted an inspection of Polygraph School of Science, Inc. and submitted a report to the Board of Director Member James McCloughan.  Mr. Ortiz is being sued in his individual capacity.

## IV.   BACKGROUND

62.    APA is a private standard-making organization that provides accreditation for polygraph schools.

63.    APA is the most widely recognized organization in the United States that provides polygraph technology school accreditation. The accreditation that APA provides to Schools is required by numerous government agencies and law enforcement entities as a contractual prerequisite when engaging polygraph education services such as PSS.

64.  In principle, APA's accreditation is voluntary. However, an increasing number of state governments require polygraph examiners to have graduated from an APA-accredited polygraph school in order to be licensed to operate. Even in states that do not require APA's accreditation, an increasing number of contractors now require APA's accreditation or give a major preference to students that have graduated from an APA-accredited polygraph school. As such, APA is the gatekeeper that determines market access and provides a business element necessary for effective competition.

65.  APA's accreditation standards are endorsed by many state government laws; however, APA has no direct state or federal oversight. With unchecked power, no accountability and very little transparency, APA is a monopoly that has almost complete control over which polygraph schools can compete in APA-regulated states.

66.  Since its inception, the plaintiffs believe APA has played an important role in developing and establishing various standards by which to measure a polygraph school's level of quality in the areas of valid and reliable means to verify the truth and establish the highest standards of moral, ethical, and professional conduct in the polygraph field. However, recent evidence suggests that APA has strayed from its core principles and is operating far beyond the scope of its authority. For instance, APA has demonstrated institutional bias (e.g., Shaw, McCloughan, Dutton, Krapohl, Nelson, Slupski, Gougler and Murphy-Carr all have conflicts of interest with competing polygraph schools, yet they refuse to recuse themselves from

accreditation proceedings involving polygraph schools), arbitrary and inconsistent enforcement of misguided standards (e.g. mandating unreasonable accreditation standards for certain polygraph schools, while overlooking the same violations of APA BOD member's schools etc.), and a lack of transparency (e.g., using and then acting on unsubstantiated reports proven to be false, refusing records requests, etc.).

67.   With 98.0% compliance of the essential elements of the APA's accreditation standards, the plaintiffs have demonstrated that PSS was in substantial compliance of the accreditation standards. However, the APA's Board refuses to acknowledge that they are in substantial compliance, ostensibly hiding behind the *"discretion of the Board"* language contained in the manual. The *"discretion of the Board"* language gives the APA's Board absolute power to deny accreditation to a school for any reason, even if PSS is in substantial compliance.

## V.   FACTS

68.   In 2007, Ms. Laura Wells ("Wells") purchased Arizona School of Polygraph Science from Tom Ezell.

69.   In 2007, Wells applied for and on September 10, 2007, was granted accreditation from APA for Arizona School of Polygraph Science.  No report was given to Wells regarding the inspection report for the accreditation in 2007.

70.   In 2009, The United States Department of Education deemed Hybrid

Courses as "the most prominent instructional delivery solution"[2].

71.   In 2011, Wells informed APA of a change of location for Arizona School of Polygraph Science.

72.   In January 2012, Arizona School of Polygraph was inspected at the new location by APA Certified Inspector Eric Holden and on May 7, 2012, was granted accreditation. No report was given to Wells regarding the inspection report for accreditation in 2012.

73.   On April 17, 2012, Arizona School of Polygraph Science formally changed its name to Polygraph School of Science, Inc., and PSS moved to its current location.  All concerned parties including the APA were notified of this change.

74.   On July 30, 2012, Wells sent an email to Bennett inquiring as to the status of the Accreditation Certificate for PSS. Defendant Bennett claimed it had been sent.  Finally on March 18, 2013, the Accreditation Certificate was received by Wells.

75.   PSS announced its entire upcoming course schedule, classes and seminars on their website: www.azpolygraphschool.com.

---

[2] U.S. Department of Education, Office of Planning, Evaluation, and Policy Development. (2009). *Evaluation of Evidence-Based Practices in Online Learning: A Meta-Analysis and Review of Online Learning Studies.* Washington, D.C.: U.S. Department of Education.

76. The APA Polygraph School Accreditation Manual, herein after referred to as The Manual, was last revised in 2004.

77. Since the 2004 revision of The Manual, the APA has changed policy without officially publishing new versions of The Manual. These policy changes are at the discretion of the BOD and are, at most times, unknown to Polygraph Schools whose Directors are not members of the BOD.

78. The BOD expects all polygraph schools to follow the rules outlined in The Manual, but, at most times, those rules are vague and unknown.

79. The BOD, at most times, do not follow their own rules outlined in The Manual, Code of Ethics, By-Laws and Mission Statement. In 2007, while working for the Los Angeles Police Department (LAPD), Ortiz was accused of changing the results on hundreds of polygraph examination and forging the original polygrapher's name to those changed reports. Ortiz was demoted from his position in the LAPD for his transgressions. This was brought to the attention of APA but no sanctions were ever brought against Ortiz even though his actions clearly violated APA Code of Ethics, By-Laws and Mission Statement.

80. Due to the economy, Polygraph Schools, like all other businesses in specific markets are struggling to survive, therefore competition for student enrollment is aggressive in this distinct market.

81. In good faith, on February 13, 2012, Wells, Bradbury, Block and Gilmore started a Hybrid Beta version of the standard On-Campus Basic Polygraph Course. The hybrid course was a combination of both the online and face-

to-face interaction coupled with ASTM Standards and adhering to APA guidelines and proved to be a cost-saving benefit to students. There were (2) students in this course and the course proved to be a success. Roberts and Block attended this course.

82. According to The Manual, each school must notify the APA office "Within 10 days after a basic course begins, the school director/administrator shall forward to the APA National Office a notice that the basic course began, appropriate beginning and ending dates for that course along with the names of all students attending the course." Wells followed this protocol for every class held at PSS.

83. In good faith, on April 15, 2012, PSS launched a campaign, via their website, announcing the new Hybrid Course and Night and Saturday Course, which adhered to APA and ASTM Standards.

84. In good faith, on May 21, 2012, PSS started their first official Hybrid Course which adhered to APA and ASTM Standards. There were two (2) students enrolled and APA was notified according to procedure in The Manual. Once again, the course was a success. Farran attended this course.

85. In good faith, on June 4, 2012, PSS held their second official Hybrid Course which adhered to APA and ASTM Standards. There were four (4) students enrolled and APA was notified according to procedure in The Manual. Once again, the course was a success. Ledford and Brennan attended this course.

86. In good faith, on July 30, 2012, PSS held their first Night and Saturday Course which adhered to ASTM Standards and exceeded APA Standards. There were two (2) students enrolled and APA was notified according to procedure in The Manual. This class, too, proved to be a success.

87. In good faith, on August 6, 2012, PSS held their third official Hybrid Course which adhered to APA and ASTM Standards. There were five (5) students enrolled and APA was notified according to procedure in The Manual. Once again, the course was a success.

88. In good faith, on September 24, 2012, PSS held their fourth official Hybrid Course which adhered to APA and ASTM Standards. There were four (4) students enrolled and APA was notified according to procedure in The Manual. Once again, the course was a success. Reynolds and Bausman attended this course.

89. In good faith, on January 7, 2013, PSS held their fifth official Hybrid Course which adhered to APA and ASTM Standards. There were seven (7) students enrolled and APA was notified according to procedure in The Manual. Once again, the course was a success.

90. On October 9, 2012, via email and Certified USPS Mail, McCloughan requested more information about the PSS's Hybrid Course.

91. On October 19, 2012, Wells and Bradbury responded to McCloughan's request for more information regarding the Hybrid Course. The course was outlined in great detail and success rates and enrollment figures were given.

93. On November 5, 2012, Ortiz, who is not an American Polygraph

Association Certified Inspector, was dispatched, by McCloughan, to PSS to perform an unannounced inspection of PSS. However, according to The Manual "Each facility will be inspected only by an APA certified inspector."

93. Ortiz failed to have President, Laura Wells sign the required American Polygraph Association Inspection Release Form, which, according the manual, is required before any inspection can commence.

94. The inspection lasted until November 6, 2012, at which time Ortiz gave Wells a list of minor deficiencies to be corrected and a list of suggestions to be implemented.  Defendant Ortiz then left PSS, failing to complete the manual's required exit interview.

95. On November 24, 2012, Ortiz submitted his false APA Polygraph School Inspection Report, herein referred to as The Report, to McCloughan.  The report contained numerous false statements regarding PSS and its operational workings.

96. On page 2 of The Report, Ortiz stated that PSS was deficient in the area of a student's intern/externship. Ortiz made the following false statement: "APA requires a minimum of ten polygraph exams and either a research paper, report on advanced readings or a report on viewed videos."  The Manual contradicts this statement and according to The Manual, PSS exceeded the minimum requirements.  Ortiz made this false statement with malice, forethought and deliberate indifference and causing extreme emotional distress, monetary loss, humiliation and loss of reputation to the Plaintiffs

and in an attempt to establish the basis for the revocation of PSS's APA accreditation so the defendants could further their illegal anticompetitive scheme

97.   On page 2, paragraph 8, of The Report, Ortiz stated that PSS was deficient in the area of Instructor Requirements.  Defendant Ortiz stated "Guest Instructor Diana McLaws did not have her transcripts on file at the school." Ortiz further falsely stated "Primary instructor David Serfustini did not have on file at the school, college degree or proof of 16 hours of yearly training." The Manual contradicts this statement.  Ortiz made this libelous statement with malice, forethought and deliberate indifference, causing extreme emotional distress, monetary loss, humiliation and loss of reputation to the Plaintiffs in an attempt to establish the basis for the revocation of PSS's APA accreditation so the defendants could further their illegal anticompetitive scheme.

98.   On page 2, paragraph 10 and page 3, paragraphs 1-3, of The Report Ortiz lists another deficiency in the area of Instructor Requirements. Ortiz falsely stated that "Each primary course instructor does not have sufficient documentation on file to verify that they meet or exceed the following:

Possess at minimum a bachelor level degree from a college or university accredited by an accepted and approved regional board. Completed a basic polygraph school course at a school accredited by the APA. All Primary Instructors have three years experience as a practicing polygraphist in the subject areas they teach."

There are two Primary Instructors at PSS: Wells and David Serfustini. Both graduated from the Arizona School of Polygraph Science, which was APA accredited at the time. Both have more than three years of experience. Both possess at a minimum a Bachelor's degree from Arizona State University. Wells has earned a Master's degree in Science from Arizona State University as well. All of Wells' academic degrees are displayed on the walls of the school – in plain sight. A copy of Mr. Serfustini's Bachelor's degree was given to Ortiz on November 6, 2012. Ortiz made this false statement with malice, forethought and deliberate indifference, causing extreme emotional distress, monetary loss, humiliation and loss of reputation to the Plaintiffs in an attempt to establish the basis for the revocation of PSS's APA accreditation so the defendants could further their illegal anticompetitive scheme.

99.   On page 3, paragraph 4, of The Report, Ortiz stated that PSS was deficient in the area of Instructor Requirements. Defendant Ortiz stated "Documentation regarding continuing education as required by the PI certification program within the last three year period is not on file." The Manual does not state that a school must keep on file proof of a Primary Instructor's continuing education, only that each instructor must complete said continuing education and then provide proof. Ortiz made this libelous statement with malice, forethought and deliberate indifference and causing extreme emotional distress, monetary loss, humiliation and loss of reputation to the Plaintiffs and in an attempt to establish the basis for the

revocation of PSS's APA accreditation so the defendants could further their illegal anticompetitive scheme.

100.    On page 6, paragraph 4, of The Report, Ortiz stated that PSS was deficient in the area of Equipment, Instructional Aides, Supplies, Etc.  Ortiz stated that "The library did not meet the APA's requirement of on-site material. According to School Director Wells, the majority of the library was stored in her garage." The Manual contradicts this statement. PSS has an extensive digital library. The digital library is on site and the students have access to it wherever they go, thus creating an even more accessible library.  Ortiz made this false statement with malice, forethought and deliberate indifference, causing extreme emotional distress, monetary loss, humiliation and loss of reputation to the Plaintiffs in an attempt to establish the basis for the revocation of PSS's APA accreditation so the defendants could further their illegal anticompetitive scheme.

101.    On page 8, paragraph 2, of The Report Ortiz states that PSS was deficient in the area of Record Keeping.  Ortiz stated that "The APA school manual requires that student folders be stored in locked cabinets."  The Manual contradicts this statement. Ortiz made this false statement with malice, forethought and deliberate indifference, causing extreme emotional distress, monetary loss, humiliation and loss of reputation to the Plaintiffs in an attempt to establish the basis for the revocation of PSS's APA accreditation so the defendants could further their illegal anticompetitive scheme.

102.    On page 8, paragraphs 8-9, of The Report, Ortiz states that PSS was

deficient in the area of Record Keeping. Mr. Ortiz stated:

> "Jodi Hay: No DVD of practice polygraph charts in package.
>
> (Unable to locate)
>
> Stephanie Garrett: No DVD of practice polygraph charts in
>
> package.(Unable to locate)."

The DVD for Jodi Hay was given to Ortiz the morning of November 6, 2012. In addition, the practice polygraph charts for Stephanie Garrett were stored on a secure external hard drive. Ortiz was made aware of this and he was told where the charts could be located, but he failed to try and view them. Ortiz made this false statement with malice, forethought and deliberate indifference, causing extreme emotional distress, monetary loss, humiliation and loss of reputation to the Plaintiffs in an attempt to establish the justification for the revocation of PSS's APA accreditation so the defendants could further their illegal anticompetitive scheme.

103.    On page 9, paragraph 1, of The Report, Ortiz made reference that "During the exit interview all the deficiencies/recommendations were reviewed and discussed." This is false. Ortiz did not complete a proper exit interview with Wells or any other Plaintiff named in this Complaint, nor was a proper Exit Interview Form completed. Ortiz made this false statement with malice, forethought and deliberate indifference, causing extreme emotional distress, monetary loss, humiliation and loss of reputation to the Plaintiffs in an attempt to establish the justification for the revocation of PSS's APA accreditation so the defendants could further their illegal anticompetitive

scheme.

104. On page 9, paragraph 4, of The Report, Ortiz stated "Based on my polygraph experience and training, personal observations and student interviews, this school did not meet numerous APA polygraph school accreditation requirements as noted by an asterisk throughout this report." Of the "numerous" requirements Ortiz stated that PSS did not meet, there were, in fact, only three (3) requirements PSS failed to meet. All three (3) of those requirements have been corrected to make this school in compliance with The Manual. Ortiz made this false statement with malice, forethought and deliberate indifference, causing extreme emotional distress, monetary loss, humiliation and loss of reputation to the Plaintiffs in an attempt to establish the justification for the revocation of PSS's APA accreditation so the defendants could further their illegal anticompetitive scheme.

105. The inspection and The Report that led to PSS's APA Accreditation being revoked was not only inconsistent and full of fallacies, but it failed to meet the rules of The Manual. Wells did not sign the APA Agreement of Inspection and Release and therefore, the inspection should have been deemed null and void.

106. On November 29, 2012, Bennett sent an email to Wells inquiring if Ortiz's Inspection Report had been received. Wells replied that the report had not been received. The emails continued for six (6) days and Wells still had not received the inspection report.

107. On December 10, 2012, Wells received a copy of Ortiz's false report via

Certified USPS Mail.  According to The Manual, PSS should have been notified of the findings within 21 days of the inspection.  PSS was notified 34 days after the inspection.

108.  McCloughan alleges that on February 1, 2013, a letter was sent to PSS informing them that their accreditation was officially revoked based on the false report submitted by Ortiz.  This letter was never received by PSS, simply because it was never sent by Bennett, thus furthering the defendants' predatory anticompetitive scheme to restrict the market share of students, which caused extreme emotional distress, monetary loss, humiliation and loss of reputation to the Plaintiffs.

109.  On March 11, 2013, Plaintiffs Wells and Bradbury were told by current PSS students that PSS's APA accreditation had been revoked.  Since Bennett never sent the letter to PSS informing them of the official revocation, Wells and Bradbury were astounded. BOD Members then started their predatory smear campaign by falsely telling students the revocation was based on the fact that PSS failed an inspection.  These false remarks have caused irrefutable harm, extreme emotional distress, monetary loss, humiliation and loss of reputation to the Plaintiffs, all employees of PSS and all past, present and future students.

110.  On March 11, 2013, Wells sent an email to Cushman requesting that the APA BOD stop telling students that  PSS's Accreditation was revoked based on the false report submitted by Ortiz and requested the BOD put their name back on APA's website list of accredited schools.  No response was ever

received from Defendant Cushman.

111.   On March 11, 2013, McCloughan responded to the emailed letter to Cushman received by Wells. McCloughan informed Wells that under the advice of General Council, Gordon Vaughan, she should write a letter to Chairman of the Board, Shaw requesting a reconsideration of PSS's revoked APA accreditation.  Wells was further advised to outline specifically why the revocation should be reconsidered.

112.   On March 13, 2013, Wells did draft a letter to Shaw outlining exactly what McCloughan suggested.  The letter was sent via email and UPS overnight letter to both Shaw and Mr. Gordon Vaughan.

113.   On March 16, 2013, Shaw sent an email to Plaintiffs Wells and Bradbury acknowledging receipt of the letter sent to her on March 13, 2013, regarding reconsideration of PSS's accreditation revocation and that the matter would be brought before the APA BOD.

114.   On March 18, 2013, Wells sent an email to Shaw requesting to know when the emergency Board of Directors Meeting will be held.  No response was ever received from Shaw.

115.   On March 18, 2013, Gordon Vaughan sent a letter to Wells regarding the emergency APA Board of Directors Meeting and a request for PSS to remove all reference to PSS being APA Accredited from PSS's website.

116.   On March 19, 2013, Defendant Baranowski sent letters to several of PSS's Hybrid Students stating they would not be approved for APA Membership based on the fact that they received a substandard education at PSS and that

they could retake their polygraph education course at another APA accredited school. This predatory smear campaign has caused extreme emotional distress, monetary loss, humiliation and loss of reputation to the Plaintiffs and was an attempt to further the defendants' illegal anticompetitive scheme.

117. Not all APA Accredited Schools are treated equally according to APA Standards, Guidelines or The Manual. BOD members who have an interest in an APA Polygraph school are afforded special considerations that other schools are denied. This is only to further their illegal anticompetitive schemes.

118. Slupski is currently the Director for American International Institute of Polygraph, an APA Accredited Polygraph School, and as such has a vested interest in this Institute. As an APA BOD Member, the fact that Mr. Slupski voted on matters involving the revocation of APA accreditation of PSS is a direct conflict of interest. This deliberate conflict of interest has caused extreme emotional distress, monetary loss, humiliation and loss of reputation to the Plaintiffs and furthers the defendants' illegal anticompetitive scheme.

119. Shaw was the Director of Kentucky Institute for Polygraph Studies, an American Polygraph Association Accredited Polygraph School, and is currently the owner/director of NPA and as such has a vested interest in this Institute. As an APA Association Board of Directors Member, the fact that Shaw voted on matters involving the revocation of APA accreditation of

PSS is a direct conflict of interest.  This deliberate conflict of interest has caused extreme emotional distress, monetary loss, humiliation and loss of reputation to the Plaintiffs and furthers the defendants' illegal anticompetitive scheme.

120.    Nelson is currently the Director of National Polygraph Studies Center, an American Polygraph Association Accredited Polygraph School, and as such has a vested interest in this Institute.  As an APA Board of Directors Member, the fact that Nelson voted on matters involving the accreditation of PSS is a direct conflict of interest.  This deliberate conflict of interest has caused extreme emotional distress, monetary loss, humiliation and loss of reputation to the Plaintiffs and furthers the defendants' illegal anticompetitive scheme.

121.    Dutton is currently employed by the National Center for Credibility Assessment, an APA accredited polygraph school and as such has a vested interest in this Institute. As an APA Association Board of Directors Member, the fact that Dutton voted on matters involving the accreditation of PSS is a direct conflict of interest.  This deliberate conflict of interest has caused extreme emotional distress, monetary loss, humiliation and loss of reputation to the Plaintiffs and furthers the defendants' illegal anticompetitive scheme.

122.    Krapohl is currently employed by the National Center for Credibility Assessment, an APA accredited polygraph school and as such has a vested interest in this Institute. As an APA Association Board of Directors Member,

the fact that Krapohl voted on matters involving the accreditation of PSS is a direct conflict of interest.  This deliberate conflict of interest has caused extreme emotional distress, monetary loss, humiliation and loss of reputation to the Plaintiffs and furthers the defendants' illegal anticompetitive scheme.

123.   Gougler is currently employed at NPA, an APA accredited polygraph school and as such has a vested interest in this Institute. As an APA Association Board of Directors Member, the fact that Gougler voted on matters involving the accreditation of PSS is a direct conflict of interest.  This deliberate conflict of interest has caused extreme emotional distress, monetary loss, humiliation and loss of reputation to the Plaintiffs and furthers the defendants' illegal anticompetitive scheme.

124.   McCloughan currently holds PSCOT classes for NPA, an APA accredited polygraph school and as such has a vested interest in this Institute. As an APA Association Board of Directors Member, the fact that McCloughan voted on matters involving the accreditation of PSS is a direct conflict of interest.  This deliberate conflict of interest has caused extreme emotional distress, monetary loss, humiliation and loss of reputation to the Plaintiffs and furthers the defendants' illegal anticompetitive scheme.

125.   Murphy-Carr is currently the assistant director of Maryland Institute of Criminal Justice, an APA accredited polygraph school and as such has a vested interest in this Institute. As an APA Association Board of Directors Member, the fact that Murphy-Carr voted on matters involving the

accreditation of PSS is a direct conflict of interest. This deliberate conflict of interest has caused extreme emotional distress, monetary loss, humiliation and loss of reputation to the Plaintiffs and furthers the defendants' illegal anticompetitive scheme.

126.    With deliberate indifference and malice aforethought, the Plaintiffs' intentional outrageous predatory conduct has caused future students of PSS to withdraw from PSS's upcoming courses, which has caused the Plaintiffs Bradbury, Block and Gilmore extreme emotional distress, monetary loss, humiliation and loss of reputation and has created an unjust enrichment for BOD members who have financial interests in their own APA accredited polygraph schools, as PSS's lost students have attended and paid tuition to BOD member's schools.

127.    On March 25, 2013, with deliberate indifference and malice aforethought Bennett did falsely tell Elizabeth Trujillo, a former PSS student, that the Night and Saturday Course did not meet APA Standards and that those students would not be approved for APA Membership, but that she could pay tuition again to go to another APA accredited school, such as one that is owned, operated and/or controlled by an APA BOD member. This intentional fallacy was just another ploy to further the defendants' illegal anticompetitive scheme, which has caused the Plaintiffs extreme emotional distress, monetary loss, humiliation and loss of reputation.

## VI. CLAIMS

### FIRST CAUSE OF ACTION

**Violation of Section 1 of the Sherman Act**
**(Antitrust – 15 U.S.C. § 1)**
**(Against All Defendants)**

128.  The Sherman Act is the Statute that is the premier article of Federal Law and its sanctions are codified at 15 U.S.C. § 1-7. The Sherman Act in its current form provides both civil remedies and criminal penalties for the principal antitrust violations – conspiracies to restrain trade, monopolization, attempted monopolization, and conspiracies to monopolize. Antitrust law is the law of competition. It is concerned with wrongs committed against competition on the merits in a given line of commerce or market. As discussed above, the classic antitrust offenses are (1) the obtaining of monopoly power by improper means, (2) the preservation or enlargement of monopoly power by improper means, (3) the abuse of monopoly power in one market to obtain monopoly power in another market, and (4) conspiring to sabotage "competition on the merits" by means of exclusionary or predatory "restraints of trade".

129.  Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

130.  The Sherman Act makes it unlawful to enter into a contract in restraint of trade or commerce. 15 U.S.C. § 1. Congress has granted a private right of action to individuals harmed by violations of this act. 15 U.S.C. § 15.

131.  Plaintiff, on their own behalf seek to recover damages suffered as a result of the defendants'' violation of the Sherman Act.

132.  The defendant's conduct affects a substantial amount of interstate commerce.

133. There is no lawful justification for that conduct, which caused direct harm to the plaintiffs.

134. APA's accreditation is essential to effectively compete in the polygraph school market, as most state licensing boards require APA school accreditation for a polygrapher to obtain license. In addition, denying accreditation puts the plaintiffs at a disadvantage with contractors in other states that require or give preference to polygraphers who have graduated from and APA accredited school.

135. The APA's Board is made up of several board members that have a conflict of interest by working for, owning and/or operating other APA Accredited polygraph schools. The Defendants had an incentive to deny accreditation to other polygraph schools, as it removes another small competitor from the market.

136. APA's antitrust violations substantially restrains and injures competition in this relevant market, and will continue to do so absent the injunctive relief the plaintiffs seek.

137. APA's conduct constitutes an unreasonable restraint of trade under either the "Quick Look" or Rule of Reason tests.

138. APA maintains substantial market power as the gatekeeper for determining what polygraph school will receive APA's accreditation, a status important for the numerous reasons detailed above. APA completely dominates and controls these markets.

139. APA has advanced no substantial, consistent justification for their antitrust

violations.

140.  Allowing APA to exclude the plaintiffs is anticompetitive, as it does not assure in any way that the public will receive better quality or lower-cost polygraph education. The lack of competition will likely also lead to the increased cost of tuition, housing and fees to students.

141.  Even if the antitrust scheme is not the product of an intentional boycott, APAs application of its standards and procedures in these circumstances is unreasonable and in violation of Section 1 of the Sherman Act as an unreasonable restraint of trade.

142.  In additional to damages, permanent injunctive relief is required to prevent the harm highlighted here, because monetary damages alone will be inadequate to compensate the plaintiffs for the irreparable harm it will continue to suffer absent relief.

143.  The plaintiffs are seeking monetary damages in the amount of $1,800,000 per plaintiff for lost wages ($45,000/year for 40 years). Due to the defendants' unlawful antitrust scheme, the plaintiffs have either lost their jobs at PSS or are unable to attain a position as a polygraph examiner because of the defendants' smear campaign stating that they graduated with a "substandard" polygraph education.

**SECOND CAUSE OF ACTION**
**(Antitrust – 15 U.S.C. § 2)**
**(Against All Defendants)**

144.  The Plaintiffs reallege the foregoing paragraphs as if fully rewritten herein.

145. Section 2 of the Sherman Act, 15 U.S.C. §2, prohibits monopolization, attempts to monopolize, or conspiracies to monopolize interstate commerce. A violation of Section 2 is punishable as a felony, and is subject to a private right of action for treble damages under Section 4 of the Clayton Act, 15 U.S.C. §15, and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

146. As discussed above, APA enjoys monopoly power in accrediting polygraph schools. APA decides which schools are eligible to conduct business within certain states or receive preferential status from hiring organizations.

147. APA writes the rules and chooses how the rules will be enforced. APA's standards demand that accredited polygraph schools be in substantial compliance, and then the APA's BOD subjectively defines substantial compliance as whatever it wants it to be for each school. Essentially, APA picks winners and losers; it decides what schools will operate in this distinct market. The APA's BOD is dominated by representatives who have a market share in their own APA accredited polygraph schools; it does not adequately represent non-BOD member-owned schools. As such, APA has tailored its accreditation standards to help BOD member's APA accredited schools and hurt non-BOD member-owned or operated schools, thus reducing competition.

**THIRD CAUSE OF ACTION**
**ARIZONA REVISED STATUTE §44-1402 AND 1403**
**VIOLATION OF THE ARIZONA UNIFORM ANTITRUST ACT**

148.   Plaintiffs incorporates and restates each of the above paragraphs as if fully set forth herein.

149.   The Arizona Revised Statutes §44-1402 and 1403 prohibits the monopolization or conspiracy to monopolize trade or commerce in the State of Arizona.  It further prohibits the establishment, maintenance or use of a monopoly or an attempt to establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices.

150.   Defendants have entered into unlawful horizontal contracts, combinations or conspiracies with its competitors in violation Arizona Revised Statutes §44-1402 and 1403

151.   Defendants have engaged in unlawful monopoly maintenance in the relevant market in violation Arizona Revised Statutes §44-1402 and 1403.

152.   Defendants have engaged in exclusionary conduct in an attempt to monopolize the relevant market in violation Arizona Revised Statutes §44-1402 and 1403.  APA has acted with specific intent to achieve a monopoly in the relevant market. Given its substantial size and market share, a dangerous probability exists that, unless restrained, APA will achieve monopoly power in this relevant market.

153.   Defendants' conduct has had anticompetitive effects in this relevant market, including those described above. The plaintiffs have been injured and damaged in their persons, by lost wages and lost reputation due to Defendants' conduct.

## FOURTH CAUSE OF ACTION
### (Interference with Economic Relations)
### (Against All Defendants)

154.   The Plaintiffs reallege the foregoing paragraphs as if fully rewritten herein.

155.   The Defendants are aware of PSSs contractual relationships with the students its serves and the importance of those relationships to PSS.

156.   In taking the actions described in this Complaint, the Defendants have intentionally and improperly interfered with previously-established business relationships and/or prospective business relations of which it knew or reasonably should have known existed between PSS and the students it serves.

157.   The Defendants have engaged in such interference by improper means, including without limitation, breach of contract, conversion of goodwill, and violation of contractual and commonly accepted business ethics and practices.

## FIFTH CAUSE OF ACTION
### (Business Disparagement / Defamation)
### (Against Defendants Cushman and McCloughan)

158.   The Plaintiffs reallege the foregoing paragraphs as if fully rewritten herein.

159.   Defendants did publish or cause to be published false statements harmful to the interests of the plaintiffs with the intent that the publication of the statements would cause harm to the interests of the plaintiffs.

160.   At the time Defendants published the false statements they knew that the statements were false or acted in reckless disregard of their truth or falsity.

45

161.   The plaintiffs have been damaged by the Defendants' conduct as complained of herein, in an amount to be determined at trial.

### VII. DEMAND

When the defendants revoked the accreditation of PSS, plaintiffs Bradbury, Block, Haswood and Gilmore were all forced lose to their jobs and student plaintiffs Bausman, Brennan, Farran, Ledford, Reynolds, Roberts, Thomas, John Does, Jane Does and Lahhoud were all subjected to being denied APA membership, the onus of having graduated from a polygraph school who has been outcast from the APA due to a "substandard education" and the inability to become employed due to not being a member of APA.  This was done in a consorted and collective effort by the defendants in an anticompetitive scheme to monopolize the market share of polygraph students.

**WHEREFORE,** Plaintiffs requests Judgment as set forth below:

1.   An award of damages, including punitive damages, against Defendants in an amount to be proven at trial..

5. An award of attorney's fees and costs incurred by the Plaintiffs in bringing and prosecuting this action.

6. Such other relief as the Court deems just and proper.

Accordingly, plaintiffs pray that this Honorable Court will allow for leniency in the filing of this Complaint by the Plaintiffs, as the Plaintiffs are not learned attorneys and are not afforded the same legal resources as a learned attorney and do not have access to the same law materials as a learned attorney, nor can they afford to hire a learned attorney, and by their own admission, the Defendants

agree that "The court noted that pro se plaintiffs should be afforded "special solicitude"." *Rabin v. Dep't of State*, No. 95-4310, 1997 U.S.Dist. LEXIS 15718 and *Haines v. Keaner, et al.* 404 U.S. 519, 92 s. Ct. 594,30 L. Ed. 2d 652 (Dkt 28).

**RESPECTFULLY** submitted this _____ day of _____ , 2014,

Melanie Haswood, pro se
C/o 202 E. McDowell Rd., #258
Phoenix, AZ  85004
602-272-8123
m.haswood@azpeinc.com

### CERTIFICATE OF SERVICE

    Under the penalty of perjury, the undersigned Plaintiff does hereby certify that a true

and correct copy of the forgoing document was served on all Parties or their counsel of

record by depositing the same in the United States Postal Service, postage pre-paid, on this

_____ day of _____ , 2014.

        Respectfully Submitted this _____ day of _____ ,   2014  ,

Melanie Haswood, pro se
C/o 202 E. McDowell Rd., #258
Phoenix, AZ  85004
602-272-8123
m.haswood@azpeinc.com

1

**RESPECTFULLY** submitted this ___ day of ___ , 2014,

2

3

4

Brian Gilmore, pro se

5

C/o 202 E. McDowell Rd., #258

Phoenix, AZ  85004

6

602-272-8123

b.gilmore@azpeinc.com

7

8

### CERTIFICATE OF SERVICE

9

Under the penalty of perjury, the undersigned Plaintiff does hereby certify that a true

10

and correct copy of the forgoing document was served on all Parties or their counsel of

11

record by depositing the same in the United States Postal Service, postage pre-paid, on

12

this ___ day of ___ , 2014.

13

14

Respectfully submitted this ___ day of ___ , 2014,

15

16

17

Brian Gilmore, pro se

18

C/o 202 E. McDowell Rd., #258

Phoenix, AZ  85004

19

602-272-8123

b.gilmore@azpeinc.com

20

21

22

23

24

25

**RESPECTFULLY** submitted this 6th day of February, 2014

,

Elie Lahhoud, pro se
C/o 202 E. McDowell Rd., #258
Phoenix, AZ  85004
602-272-8123
elahoud2006@hotmail.com

## CERTIFICATE OF SERVICE

Under the penalty of perjury, the undersigned Plaintiff does hereby certify that a true and correct copy of the forgoing document was served on all Parties or their counsel of record by depositing the same in the United States Postal Service, postage pre-paid, on this 6th day of February, 2014

Respectfully Submitted this 6th day of February, 2014

Elie Lahhoud, pro se
C/o 202 E. McDowell Rd., #258
Phoenix, AZ  85004
602-272-8123
elahoud2006@hotmail.com

1

**RESPECTFULLY** submitted this ___ day of _Feb_ , 2014

2

3

4
Dean Bausman, pro se

5
C/o 202 E. McDowell Rd., #258
Phoenix, AZ  85004

6
602-272-8123
coloradopolygraph@gmail.com

7

8

9
## CERTIFICATE OF SERVICE

10
Under the penalty of perjury, the undersigned Plaintiff does hereby certify that a true

11
and correct copy of the forgoing document was served on all Parties or their counsel of

12
record by depositing the same in the United States Postal Service, postage pre-paid, on

13
this ___ day of _Feb_ , 2014.

14

15
Respectfully Submitted this ___ day of _Feb_ , 2014,

16

17

18
Dean Bausman, pro se
C/o 202 E. McDowell Rd., #258

19
Phoenix, AZ  85004
602-272-8123

20
coloradopolygraph@gmail.com

21

22

23

24

25

**RESPECTFULLY** submitted this 6th day of February, 2014

Bradley Ledford, pro se
C/o 202 E. McDowell Rd., #258
Phoenix, AZ  85004
602-272-8123
b.ledford@azpeinc.com

## CERTIFICATE OF SERVICE

Under the penalty of perjury, the undersigned Plaintiff does hereby certify that a true and correct copy of the forgoing document was served on all Parties or their counsel of record by depositing the same in the United States Postal Service, postage pre-paid, on this 6th day of February, 2014

Respectfully Submitted this 6th day of February, 2014

Bradley Ledford, pro se
C/o 202 E. McDowell Rd., #258
Phoenix, AZ  85004
602-272-8123
b.ledford@azpeinc.com

**RESPECTFULLY** submitted this _____ day of _____, 2014,

William Reynolds, pro se
C/o 202 E. McDowell Rd., #258
Phoenix, AZ  85004
602-272-8123
billsawmill@gmail.com

## CERTIFICATE OF SERVICE

Under the penalty of perjury, the undersigned Plaintiff does hereby certify that a true and correct copy of the forgoing document was served on all Parties or their counsel of record by depositing the same in the United States Postal Service, postage pre-paid, on this _____ day of _____, 2014.

Respectfully submitted this _____ day of _____, 2014,

William Reynolds, pro se
C/o 202 E. McDowell Rd., #258
Phoenix, AZ  85004
602-272-8123
billsawmill@gmail.com

**RESPECTFULLY** submitted this 6th day of February, 2014

*Nancy Farran*

Nancy Farran, pro se
C/o 202 E. McDowell Rd., #258
Phoenix, AZ  85004
602-272-8123
nancyfarran@yahoo.com

## CERTIFICATE OF SERVICE

Under the penalty of perjury, the undersigned Plaintiff does hereby certify that a true and correct copy of the forgoing document was served on all Parties or their counsel of record by depositing the same in the United States Postal Service, postage pre-paid, on this 6th day of February, 2014

Respectfully Submitted this 6th day of February, 2014

*Nancy Farran*

Nancy Farran, pro se
C/o 202 E. McDowell Rd., #258
Phoenix, AZ  85004
602-272-8123
nancyfarran@yahoo.com

**RESPECTFULLY** submitted this 6th day of February, 2014

Devin Brennan, pro se
C/o 202 E. McDowell Rd., #258
Phoenix, AZ  85004
602-272-8123
dbrennan32@yahoo.com

## CERTIFICATE OF SERVICE

Under the penalty of perjury, the undersigned Plaintiff does hereby certify that a true and correct copy of the forgoing document was served on all Parties or their counsel of record by depositing the same in the United States Postal Service, postage pre-paid, on this 6th day of February, 2014

RESPECTFULLY submitted this 6th day of February, 2014

Devin Brennan, pro se
C/o 202 E. McDowell Rd., #258
Phoenix, AZ  85004
602-272-8123
dbrennan32@yahoo.com

RESPECTFULLY submitted this 6th day of February, 2014.

_____
Kelley Bradbury, pro se
Plaintiff
15620 W. Myrtle Ave
Litchfield Park, AZ  85340
623-256-1664
mhigurl@gmail.com

## CERTIFICATE OF SERVICE

Under the penalty of perjury, the undersigned Plaintiff does hereby certify that a true and correct copy of the forgoing document was served on all Parties or their counsel of record by depositing the same in the United States Postal Service, postage pre-paid, on this 6th day of February, 2014

Respectfully submitted this 6th day of February, 2014.

_____
Kelley Bradbury, pro se
Plaintiff
15620 W. Myrtle Ave
Litchfield Park, AZ  85340
623-256-1664
mhigurl@gmail.com

**RESPECTFULLY** submitted this 6th day of February, 2014

Timothy Roberts, pro se
Plaintiff
15620 W. Myrtle Ave
Litchfield Park, AZ  85340
623-326-8577
stickypickle@aol.com

## CERTIFICATE OF SERVICE

Under the penalty of perjury, the undersigned Plaintiff does hereby certify that a true and correct copy of the forgoing document was served on all Parties or their counsel of record by depositing the same in the United States Postal Service, postage pre-paid, on this 6th day of February, 2014

RESPECTFULLY submitted this 6th day of February, 2014

Timothy Roberts, pro se
Plaintiff
15620 W. Myrtle Ave
Litchfield Park, AZ  85340
623-326-8577
stickypickle@aol.com

**RESPECTFULLY** submitted this 6th day of February, 2014.

Morgan Block
2036 S. St. Michael Drive
Tucson, AZ 85713
520-270-3597
Block.morgan@gmail.com

## CERTIFICATE OF SERVICE

Under the penalty of perjury, the undersigned Plaintiff does hereby certify that a true and correct copy of the forgoing document was served on all Parties or their counsel of record by depositing the same in the United States Postal Service, postage pre-paid, on this 6th day of February, 2014.

Respectfully submitted this 6th day of February, 2014.

Morgan Block
2036 S. St. Michael Drive
Tucson, AZ 85713
520-270-3597
Block.morgan@gmail.com

**Respectfully** submitted this 6th day of February, 2014

## CERTIFICATE OF SERVICE

Under the penalty of perjury, the undersigned Plaintiff does hereby certify that a true and correct copy of the forgoing document was served on all Parties or their counsel of record by depositing the same in the United States Postal Service, postage pre-paid, on this 6th day of February, 2014

Respectfully Submitted this 6th day of February, 2014

Dan Thomas, *pro se*
9805 Burns Drive
Sun City, AZ  85351
360-524-1066
liveaboardpdx@yahoo.com